May it please the Court. My name is Daniel Duco. I represent Susan Dorety. In my time before this Court, I hope to address two issues. One, whether the trial court properly took away questions of fact, pure questions of fact, from the jury a week before trial. And two, whether the trial court, when it took away pure questions of fact, whether it committed clear error in ruling that Michael Dorety contracted COVID-19 while on the high seas. As the Court is aware, Susan and Michael Dorety boarded the Princess Cruise in February of 2020 to celebrate their 40th wedding anniversary. What they didn't know was that there were holdover passengers on that cruise from the prior cruise that had COVID-19 symptoms. They also didn't know that another cruise ship owned by Princess, the Diamond Princess, had an outbreak of COVID-19 on that ship. And so when they boarded this ship, they weren't aware of the fact that they were exposed to COVID-19. Eventually, Michael Dorety contracted COVID-19, and he died of COVID-19. After a year and a half of litigation, after 12B6 motions, after expert designations, after summary judgment motions, after depositions, after a full pretrial hearing, one week before the trial date, the trial court determined that he, as opposed to the jury, would be the one who would decide pure questions of fact in this case. Now, as the Court is aware, this is an admiralty case sitting in diversity. And as a result, Susan Dorety was entitled to a trial by jury. And as a result, the issues with respect to the fact questions were to be decided by the jury. Now, this is precedent in maritime cases. In maritime cases involving a jury, the jury is the one who is asked to decide the facts, and the judge is the one who is asked to decide the law. For example, we cited a couple of examples. One very good one is Jones Act versus longshore cases. Jones Act cases, as the Court is aware, has a jury. It has mental anguish. It has remedies that are available to a Jones Act seaman that are not available in a longshore case. In a longshore case, you try the case to an administrative judge. In a longshore case, you're only entitled to pecuniary laws. So opposing counsel is going to get up and argue that this was jurisdiction and that the Court had to decide whether it had jurisdiction. So what is your best argument? My argument to jurisdiction, Your Honor, is this Court in Albino versus Boca described jurisdiction as a judicial traffic control issue. It is an issue that has to be decided at the beginning of the case, and it is an issue that the judge is to apply a legal analysis to minimal facts. In jurisdictional issues, you submit maybe an affidavit or declaration. Maybe you submit a document. You have the pleadings. The Court looks through the pleadings and decides jurisdiction. In a jurisdictional issue, you do not have a full-blown trial in which all of the facts of the trial are then ascertained so that you can decide jurisdiction. So to answer the question with respect to jurisdiction, this is vastly different than jurisdiction because jurisdiction, being a judicial traffic control device, is different from a full-blown hearing. And so when you look at some of the other issues with respect to 18 U.S.C. Back you up. So it seems to me then what you're really saying is the judge had to convene a jury to find these facts, and only then would he know whether he's got jurisdiction? Your Honor, again, the Court had jurisdiction the whole time. The only issue was whether or not DOSHA applied. The Court always had jurisdiction of the case whether DOSHA applied or not. I think I misunderstood your earlier answer then. As long as you're confining this to DOSHA, which is really, in this case, a function of what damages are going to be available, then I understand your answer. Go ahead. Right, but I also would like to point out the fact that even under jurisdictional arguments, even under choice of law arguments, if the facts of the case are inextricably intertwined with the case, then the Court should not decide jurisdiction at all. The Court should have a trial and then decide jurisdiction. And, in fact, if you look at the choice of law arguments, the Court should have a trial and let the special verdict form, and it could also include the entire case could be tried, but based on the findings of the jury as to when Mr. Doherty contracted, he would limit the available remedies to either DOSHA or not. Exactly, Your Honor. And, for example, if you look at the NRA Facebook biometric case that is cited by Princess, it's a choice of law decision. And in that case, the Court said, we have the right to determine this now without a jury to determine whether choice of law applies. However, there are times in a rare situation it's possible that a choice of law fact dispute is so wound up in the substantive claims that the Court cannot decide it without compromising the constitutional guarantee of a jury. Right, and that's well briefed. So what's the standard we apply to the judge? Had a separate hearing. He was clearly grappling with this. He didn't have a lot of guidance in case law, right? And what standard do we apply to his decision to hear this himself? Your Honor, the standard that we would apply according, in my belief, is the standard that you look to in admiralty cases that have a jury. In admiralty cases that have a jury, the jury decides questions of fact and the judge decides questions of law. For example— But I'm asking a different question, counsel. I think I wasn't clear. You're asking us to review the judge's decision to decide himself. Right. What's the standard of a review you want us to apply to that decision? Conclusions of law are de novo. Standard review. Does that answer your question? Yeah, you've answered my question. Yes. And so when you look to 18 U.S.C. No. 7, federal criminal charges are committed within special maritime and territorial jurisdiction of the United States. That is directly an issue in which the jury decides where the crime occurred and that the judge takes that and decides whether or not this statute applies. And when you go back to the NRA Facebook biometric case, they cited a very good example of a case in which the case is inextricably intertwined with the facts of the case and must be decided by a jury. In the Mara v. Bushy case, there was a loss of consortium claim based on a marital affair. The choice of law depended on where the affair primarily occurred, and the court held a jury rather than the judge should determine the territorial location of the alluring conduct. And so what that court held was, if you want to determine where the crime occurred or where the incident occurred, you ask the jury to make that determination. Then the judge applies that law to that determination. That is what we would ask this court to do. And so can I? I have a question that has been bothering me. Both sides seem to agree that the side of the accident for purposes of determining whether DOSHA applies is when Mr. Daugherty first started exhibiting symptoms. Why is that the wrongful act? It seems to me that the wrongful act would be a corporate decision that Princess Cruz made that to sail the ship assuming all these risks or to not take certain precautions that should have been taken earlier. To me, that seems to be the wrongful act here, not the result of the wrongful act, which is Mr. Daugherty got sick with COVID and died. Just to be clear, our allegations include the wrongful act being the corporate decision of Princess to actually sail the ship. Our allegations include the wrongful act of allowing the ship to go out knowing what they knew. The issue becomes, and why it becomes such a microscopic issue, is because Susan Daugherty has no damages under DOSHA. I understand that, but what I'm saying is for purposes of determining under DOSHA the site of the accident, why are you looking at this issue at all? When he showed symptoms, why isn't the wrongful act or the site of an accident something else in this case? Well, we looked at it from both ways, and the best way to determine when Michael Daugherty contracted COVID— Oh, no, back up. Judge Wardlaw, I have the same question. Why isn't the TORSHA's conduct the decision to sail? It is the TORSHA's conduct. Well, we know where the vessel was when that decision was made, I think, or at least we can hypothesize it wasn't cruising around through the islands in Hawaii, right? So it seems that it would have been in territorial waters. That's what we're trying to— I certainly agree with that. It's not what the briefing does. The briefing—and I think both parties do this. I think I agree with Judge Wardlaw on this point if I understood her question correctly. You both seem to jump off on the perspective of the TORSHA's conduct. So if it happens, the action picks up at the point where the disease was contracted. Well, unfortunately for the plaintiffs in this case, the DOSHA case law is very clear that if you look at the day and the time Michael Daugherty contracted COVID— How is it clear? That's what your briefing talks about. The cases talk about the point of the—you know, you're typically talking about a different kind of an injury to be sure, some shipboard injury somewhere, right? Right. But we made the argument, and we would continue to make the argument, that by sailing the ship, they committed a wrongful act. But when you interpret the DOSHA cases, the DOSHA cases clearly say that in order to determine whether DOSHA applies, you have to look at the time Michael Daugherty contracted the disease. You can't look at the wrongful conduct that occurred here when they sailed. You have to look at the day he contracted it. So you're conceding that? You're not arguing that we should revisit that issue? I mean, it seemed to me that that was based on some lower court decisions that were not necessarily binding on this court, but you seem to have conceded that for purposes of determining whether DOSHA applies, the operative location is where Daugherty contracted COVID. Yes. And based on our research, we don't see any way around it. You're not—you're just going to concede that? Right. We have to, Your Honor. Well, you did. And I think it was my law clerk who dug up all these other lower— because I had that question. Why would you concede that the site of the accident is the contracting of a disease? And it's simply based on the research that we did and the determination that under DOSHA you have to look at the situs of the injury, the place where the injury occurred. And I think there's— You say—the statutory language says site of the accident. There wasn't an accident here. Right, but there was an injury. And so the courts have held that the injury is the accident. And so there was a date that might— And another question I have on this is why— he obviously contracted it sometime before he showed any symptoms, right? Yes, Your Honor. So that's the date you're looking to, like some date that's calculated based on an incubation period? Yes. Okay. And to get into that issue, we looked at it from the front end and we looked at it from the back end. And the back end is all the experts agree between five to six days is the incubation period. And so if you find the first day of symptoms and you back it up five or six days, that is the day that Michael Dougherty contracted COVID. We didn't just approach it from that point of view. We also looked at the evidence showing when Michael Dougherty was exposed to COVID. And we found, even according to their own expert, we found that on February 28th he was on the tender boat, which was a tightly packed, poorly ventilated, enclosed space with six other people who had COVID. So this all depends upon which symptom you tag it to, right? And so there's Mrs. Dougherty reported that he had loss of appetite and she reported that he took a nap the next day and used his CPAP machine, and she said that was really unusual for him. And then a couple days later, I think on March 7th or 8th, then he's got symptoms. And defense counsel's expert glommed onto the fever. And I think the opposing counsel argues that's the first conclusive symptom of COVID. And I think when you do the retrospective, you begin from the premise that we know this individual very tragically died from COVID. So we look at that date and work backwards. And it seems to be that your argument that opposing counsel needs to disprove, because they have the burden, it's their affirmative defense, that those earlier symptoms weren't COVID. Well, just to be clear, Michael Dougherty only had COVID. He didn't have seasonal flu. I appreciate that. But I'm talking about the symptoms. Right. And your timeline keys to you said we looked at the symptoms. And, of course, those start dribbling out over, as one would expect, over the course of a few days. So why is it correct that we should – I think you start with his widow reporting loss of appetite. Yes. Okay. And the reason why we look to the symptoms expressed by Susan Dougherty is because they are COVID symptoms. Loss of appetite is a COVID symptom. That's what's so hard, right, because we've got to figure out whether the district court made – whether his findings were clearly erroneous. And the kind of symptoms we've all learned in the last few years, more than we ever wanted to know about COVID, lots of things are consistent with COVID and with, you know, nothing at all. So it's tough, right? And I think the first two symptoms in your case chronologically are the loss of appetite and the CPAP machine. And it's a couple days later where there's a fever. And I don't think the defense even disputes that the fever is definitely – at that point, the clock is certainly ticking. What's your best argument about the earlier symptoms, please? Well, in the analysis that you're making is all of us get COVID, and some of our symptoms could be attributable to something else. No, no. I'm taking it to – for in this case, we know tragically he died of COVID. So we're looking the other way around. I appreciate that. In this case, Michael Dougherty went to the emergency room and was tested for everything and tested negative to everything except COVID. I know, sir, but you still have the problem of the symptoms. You've got to start the clock in the incubation period from symptoms. Right, but there is no other explanation for those symptoms. Well, that's my question. There's no other explanation for loss of appetite? Exactly. COVID's symptom is loss of appetite. Everybody knows that. It's well documented. Our experts testified. Their experts testified. Loss of appetite is a COVID symptom. It is a COVID symptom, but this gets to be, you know, really splitting hairs, and I don't mean to do that. I fully appreciate this is a very tragic case, and you certainly have our sympathy. I'm just trying to figure out legally, you know, the principled way you get there because COVID – loss of appetite isn't just symptomatic of COVID, and they have the burden of proof, to be sure, right? But we've read the testimony of their expert on these points, and I just want your best response. My best response, Your Honor, is they have the burden, and they cannot prove that the loss of appetite, the shortness of breath, the fatigue relate to anything other than COVID. Okay, so my question a minute ago, and I'm taking up too much of your time, was I think you're arguing that they need to disprove those symptoms, that they weren't, you know, understanding that Mr. Doherty died of COVID, that looking back, they need to disprove that those weren't COVID, and I think your answer is yes. Absolutely. Okay, thank you. Can I just ask one question? Sorry. Since your primary argument is that the district court engaged in improper fact-finding and a question that should have gone to the jury, if we agree, is then that we should remand instead of reviewing the decision for clear error and deciding the dose of preemption issue ourselves? Yes, Your Honor. The case should be remanded for a full trial with a jury. Thank you, Your Honor. May it please the court. There's obviously a legal question and a clear error question here, so obviously I'll start with the legal question about whether Judge Klausner properly determined that it was for the court rather than a jury to resolve contested facts about whether DOSA applies. As every court, admittedly a small number, that has addressed this question has found, this is a question for the court to decide. This was what the Freedman Court found, what Judge Klausner found, and also Judge Gee in the Campbell case as well. Judge Klausner and Judge Gee analogized Judge Klausner on the one hand to the preemption context. Judge Gee, on the other hand, analogized it to choice of law. Right. Those cases aren't binding on us. Is there anything that the circuits decided or our fellow circuits? So no, I'm not aware of any appellate decision that specifically addresses this DOSA question. I think the analysis that Judge Klausner and Judge Gee followed was to look to analogous circumstances. The Supreme Court was pretty clear, I think, in Markman but also in the Merck decision in explaining that even in situations where there is an underlying Seventh Amendment right to a jury trial, that doesn't mean that every contested fact issue in the run-up to the jury trial has to go to the jury. There are plenty of instances where those contested facts ought to be decided by the court. Right. Can you respond then specifically to the argument that in this case the facts are so intertwined that at least in this case it was complicated enough that it should have gone to a jury? So certainly I think the level of complication itself I think is hard in the abstract to define. I think the argument that the plaintiffs articulated, that this was bound up in the merits, I think could not be more incorrect for a couple of reasons. The determination that DOSA applies did not end the case. A determination that DOSA applied meant that when they went to trial, their case would be tried under DOSA. They would have still had an opportunity to put on a case in front of a jury. We don't think that there was a jury trial right, but we can put that aside. They still would have had a right to put on a trial to show that Princess was negligent, was grossly negligent. They could have pointed to all of those issues that they talked about. Right, but what DOSA does is limit the amount of damages available. DOSA is the exclusive remedy. And the types of damages that are available. So it does a couple of things, Your Honor. It does, you're correct, I agree, it does define and limit the scope of damages. But it also is an exclusive remedy. So it precludes reliance on any other law, whether it's state law as a supplement, which normally you can do in maritime, or it prevents you also from relying on any additional general maritime claim. In your briefing it says true preemption, right? I'm sorry, I didn't hear. I think your position is that it's true preemption. I mean, preemption I think is a little bit of a, I mean, it's not a preemption statute in the same way. If you buy this, if you buy into this, I'm trying to make sure that you've accepted that you bore the burden of proof. We're not seriously disputing that on appeal, Your Honor. I think... Okay, so if that's the case, then can you go to where we left off a minute ago about these symptoms? Sure, Your Honor. If your client had the burden to disprove those symptoms, what is your best argument? Sure. So Dr. Jerome addressed this in great depth in his testimony. And what he explained is that these early symptoms, I think there are actually two points that are very important here. Number one is that these early symptoms are nonspecific symptoms. They can be attributed to COVID, but they could also be attributed to a lot of other things. And in the record here, there was testimony to establish alternative possible causes for these early symptoms. Mr. Daugherty wasn't eating as much, but there was testimony that he didn't like the food because they were confined to their rooms. And passengers at that time, they were in quarantine. Nobody had control over what they were eating, so he was eating less. He was sleeping a lot more. But again, they were confined to their rooms, and the testimony was that they were bored. All they had was a bed and a TV, and so he slept a lot. The testimony, too, is that he not only took a nap that afternoon, but that he used the CPAP machine. And she said that's quite unlike him for a nap. That's correct. Dr. Jerome addressed this as well. And what he explained is that the CPAP machine, what it does is it opens up your airways. And so people who use a CPAP normally, they'll use it when they're sleeping, when they're on their back. When he was at home, Mr. Daugherty would nap in a recliner. That, as Dr. Jerome explained, that sort of acts like kind of a natural CPAP. That posture essentially opens up your airways. He didn't have a recliner in the room. He was laying on his back. Therefore, he needed the CPAP while he was napping. My question is, you have one expert saying it might have been something other than COVID. You have one expert saying it could have been COVID. If it's your burden to prove that it was not COVID, why doesn't plaintiff prevail on this issue? Well, for a couple of things. I think, number one, we addressed that there were explanations that Dr. Jerome provided for these early symptoms. The second issue is this incubation period. Plaintiff's counsel stated that it was undisputed that the incubation period was five to six days. That is not correct. That was not our position. That was not Dr. Jerome's testimony. Dr. Jerome's testimony is that the incubation period is a long one. He explains that's one of the very reasons why COVID proved so difficult to contain. The incubation period is at least two to about 14 days. And there's testimony from Dr. Jerome stating that you have some people who experience symptoms almost right away. You have some people who are at the far end who experience symptoms 14 days out, even longer. The five to six day statistic, that refers either to the median incubation period or the average incubation period. And Dr. Jerome specifically testified multiple times at this hearing that even if you think that those early symptoms were COVID on March 4th, March 5th, March 6th, that does not lead to a conclusion that he necessarily contracted COVID on the tender. He could have contracted it before the vessel entered territorial waters. He could have contracted it after the vessel left territorial waters. My understanding is plaintiff doesn't need to prove that he contracted on the tender. You need to prove that he didn't. So the other part of Dr. Jerome's testimony that I think is critical is that he is the only one who conducted any type of comparative analysis looking at the risks of exposure that Mr. Doherty faced. And Dr. Jerome analyzed in great detail the risks that were present on the Grand Princess. He explained that while there was testimony that the Doherty's mostly kept to himself, there also was testimony that the Doherty's ate breakfast every day in the Horizon Court Buffet, a 750-person restaurant where Dr. Jerome explained you had the possibility for contraction by way of fomites, droplets, but especially aerosol. And again, this is all in Dr. Jerome's testimony. He explained how with aerosol transmission, it doesn't matter whether you come into direct contact with somebody who has COVID. They could be on the opposite side of the dining room, and the aerosol hangs in the air. It builds up over time and essentially wafts around infecting everybody. They had lunch in these dining rooms and dinner and before dinner were at a bar for about an hour. And Dr. Jerome explained these were incredibly high-risk exposures that they would have faced. This is especially so because there was undisputed evidence that there was an outbreak of COVID that was specifically centered in individuals who were working in the food service part of the crew. These were individuals who were working in the restaurants that the Doherty's were eating in. So you have that testimony. Dr. Jerome also looked at the alternative. Is it possible that he contracted COVID in the tender? And Dr. Jerome explained why that was, in his view, much less likely. He explained, number one, the duration of the exposure was simply much less compared to all of the exposures that Mr. Doherty had in the dining rooms and on the Grand Princess when it was on the high seas. Second, ventilation... But, excuse me, at that point, didn't he include all of the time on the high seas, including the time coming back from Hawaii, all of the... It seems to me he included the entire voyage, which was an apples to oranges comparison. So the testimony in the hearing from Captain Smith, he calculated that 85% of the time it was on the high seas from when it left San Francisco until when it returned to Oakland. Yes, but that's not terribly helpful. I'm sure we all know, right? Because the target time we're talking about is much narrower. Well, I don't think it's that much narrower because, again, Dr. Jerome explained that the incubation period, it includes people who develop symptoms really, really quickly. And so maybe you shave off, right? I think in Dr. Jerome's view, the fever on March 9th was, in his opinion, certainly COVID. So even if you exclude March 9th, that still leaves much more time when it was on the high seas. All of this argument to me, and I'm sorry I'm standing. I'm having a little back issue right now. But all of this argument seems to me to say we don't know where Mr. Dougherty contacted it. And if the burden of proof is on you, where does that leave us? Well, I don't think that was not the testimony at all in the district court, Your Honor. Dr. Jerome does provide an opinion about where he thinks the contraction occurred, and he states in his view it was more likely than not, he says, around March 3rd. And at that time, the vessel would have been on the high seas. He explained, again, he's the only one who did a comparative analysis. He looked very closely at the possibility of contraction on the tender, and he identified it had the shorter duration, it had much better airflow, because the tops essentially were open, and there was testimony that there was about a 17-knot wind that was coming in. And Dr. Jerome explained that that would have helped circulate the air and flush out any aerosols. He also explained that the tender occurred earlier in the voyage, and according to Dr. Jerome, that meant there would simply have been fewer people who had COVID at that time compared to later in the voyage when there would have been more COVID circulating, providing more opportunities for contraction. The other really big difference about the possibility of contraction on the tender versus on the Grand Princess is that it is only on the Grand Princess that we know that there were individuals who had COVID. Plaintiffs referred to testimony stating that there were six people on the tender who had COVID. That was never admitted into evidence. Dr. Fox, the plaintiff's expert, attempted to provide that testimony. It was hearsay. Princess objected, and Judge Klausner sustained the objection. And when you look at Dr. Fox's testimony, it is clear that the only reason he seems to think that the tender was the most likely place for contraction is because he believed that there were infected people on the tender. Once you take that away, there is simply no evidence, there is no reason to believe that it was more likely than not on the tender or elsewhere. Dr. Jerome, again, he looked at all of these sources of exposure. Dr. Fox didn't. He admitted that he was just looking at the tender. He didn't consider the time and the possibilities of exposure on the vessel because, in his view, it didn't matter. Dr. Jerome did that comparison, and his ultimate conclusion is that it was more likely than not that the contraction occurred on the vessel, not anywhere else. That fully complied with the burden that Judge Klausner allocated to us, and on clear error review, Judge Klausner was certainly well within his discretion to essentially follow the expert testimony of Dr. Jerome over the testimony of Dr. Fox. There was abundant evidence that Dr. Jerome provided to explain his methodology, to address all of the symptoms that there was testimony about, and ultimately, Judge Klausner came to the conclusion that the opinions that Dr. Jerome provided were the more credible. That is a consummate decision for a district court judge to make on clear error review, and his opinion fully addresses and explains why he thinks there is sufficient evidence to support contraction on the vessel as opposed to on the tender. He looked at the range of symptoms. He looked at the incubation period, and he looked at the risk factors that Dr. Jerome elucidated on the vessel as opposed to on the tender. And when you put all of those together, it fully supports the decision that contraction on the vessel was more likely than not. I can go back for a second to the legal issue, Your Honor. I think the court doesn't need to fully address the question of whether there is a jury trial right in a DOSA action, but Judge Klausner's decision on that really does stand alone. I'm not aware of any cases that have found in a case like this one, where there is no separate statutory right to a jury trial and there is no other supplementary claim that is possible, like a Warsaw Convention Act claim that would provide a right for a jury trial. There is simply no case law out there that supports a jury trial right in these circumstances, notwithstanding the existence of diversity jurisdiction. And that provides really an additional compelling reason why it makes much more sense, as a matter of judicial administration, that the resolution of the disputed fact goes to the court rather than the jury because then you have a situation where a jury is deciding whether or not there is a right to a jury trial in the first place. And that simply doesn't make sense. And that's essentially consistent also with the decisions that Judge Gee relied upon. I do want to quickly note that while it is true that in the Campbell case, there ultimately was a stipulation about DOSA, but that came after Judge Gee wrote her opinion holding that the allocation of responsibility for the disputed fact goes to the court rather than a jury. That issue was fully contested by the plaintiffs. It was fully briefed, and that's why Judge Gee wrote an entire opinion on it. Your Honor, we contend that Judge Klausner properly determined that this was a decision for the court and that there is nothing in the record to support a finding that his ultimate decision was clearly erroneous. There are no other questions from the court. We ask this court to affirm. Mr. Duco, you can have a couple minutes. Yes. To address the issue raised by counsel, I want to read from the brief of Princess on page 50. After going through the testimony of Dr. Jerome, Princess said, it was impossible to determine whether the nonspecific symptoms Mr. Doherty experienced were due to COVID-19 or some other cause. And so what we have is Princess, throughout this entire trial, conceding. It had no idea where Michael Doherty contracted COVID. It had no idea whether Michael Doherty was exposed to somebody with COVID on the high seas. It had no idea whether the symptomology related to him developing it on the high seas. And that was their burden. What the plaintiffs proved, what Susan Doherty proved, was Michael Doherty was exposed to six people with COVID on an enclosed tender at the exact time they were in U.S. waters. What she established through the testimony Susan Doherty established is the symptomology that was set forth that the court asked about was not just her testimony, but when Dr. Kimura, the emergency room doctor, took the history of Michael Doherty, who described him as a good historian, Michael Doherty said his symptoms for COVID began on March 5th. We have the medical records. Can you respond, sorry, just on the six other passengers on the tender, both your friend Cross's argument that that was an admissible hearsay that they objected to? Your Honor, that came from, if you look in the record, that came from their doctor, I mean their witness that was elicited on cross-examination. Later on we checked. Sorry, what was elicited on cross-examination? That the people on the tender did or did not have COVID. The fact that there were six people that tested positive on the tender originally came from the testimony of Princess's own witness. Later on we tried to discuss it with our expert. That's when they objected to it. But if you look in the record, it is part of the record, the fact that there are six people who were on the tender who tested positive to COVID. And that wasn't objected to? Correct. Okay. And so what we have is we have proved with unrefutable evidence that his symptomology shows that he developed COVID while in U.S. waters. He was exposed to COVID while in U.S. waters. We've proved all of that over and over throughout the course of the trial, and they proved nothing. Princess has the ability to track every move you make on a cruise ship. They have key cards. They know when you go to dinner. They didn't present one person that Michael Dougherty got exposed to COVID with that stood next to, that had dinner with, that was at a buffet with. Nobody. Not one person while they were on the high seas. No evidence. We presented six people that Michael Dougherty was exposed to. Princess presented absolutely no evidence and is left with the idea that, well, I mean, the boat was out in the water more than it was in U.S. waters. Well, that's not the standard. The standard is whether or not Michael Dougherty contracted COVID while in U.S. waters. And I hate to go back to the fact that, you know, I represent Susan, and there is a truth to this case. So forgive me. And so what's your best shot? The district court decided this differently. Sometimes we decide that we might have ruled differently in the trial court. The district court reached a different conclusion, and your burden is to show that his findings of fact were clearly erroneous. I go to the U.S. versus Gypsum case, in which clearly erroneous is defined as the conviction that a mistake has been committed. There is no dispute that a mistake has been committed in this case because we have direct evidence showing Michael Dougherty was exposed to COVID while in U.S. waters. We have direct evidence, unrefuted evidence, that his symptomology developed at the time that when he was exposed on the tender, five to six days later, he developed symptoms. We have a doctor, a doctor who is not paid by either side, Dr. Kimura, who saw hundreds of COVID patients, who said his symptomology began on March 5th. We have medical records establishing that. And so the question that this court should ask is, was a mistake committed? And the truth is he developed COVID while in U.S. waters. The judge didn't want to see that and committed a mistake. And we would ask that this court remand this case back to trial. All right. Thank you very much, counsel. Dougherty v. Princess Cruz vines will be submitted.
judges: WARDLAW, CHRISTEN, SUNG